# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | Criminal Case No: 1:24CR00102 |
| | ) | |
| **KIMBERLY SYLVESTER** | ) | Sentencing: June 13, 2024 |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM OF KIMBERLY SYLVESTER

Kimberly Sylvester is a 59-year-old single grandmother, a mother to two adult daughters from prior marriages which ended in serious physical abuse and infidelity, and a registered nurse who has worked in Oncology, Ortho-Neuro, Dementia, Physical Rehab and general Medical/ Surgical nursing, among other fields of nursing. Kimberly is a loving and caring woman who has dedicated her life to helping others — both at work and on her free time, caring for all the people and pets in her neighborhood who need a hand. For her entry into the Capitol on January 6, Ms. Sylvester has consistently and continuously expressed regret, embarrassment, and remorse, and continues to do so to this day. Her friends, including those who have retired from law enforcement, support her, enthusiastically gush about her benevolence and good moral character, and corroborate her consistent remorse.

The Defense submits to the Court that a fine in the amount of $50 is the appropriate penalty for this first-time offender, for her first criminal convictions for two Class B misdemeanor petty offenses, *Parading, Demonstrating, or Picketing in a Capitol Building* and

*Disorderly Conduct on Capitol Grounds;* or, alternatively, based on this courtroom's prior judgments in January 6 cases, a sentence of probation that is a few months in duration.

The relevant conduct in this case is nonviolent parading on January 6, 2021 in the Capitol Building. Ms. Sylvester was alone and her time inside was uneventful. She did not touch or damage any property. She exchanged pleasantries and engaged in nice conversations with police officers. She spent 59 minutes inside the Capitol Building, although uneventfully. She even stayed within the red velvet ropes whenever she could. Ms. Sylvester accepted responsibility and has notable remorse for her entry and continued presence in the Building as adding to the tumult of that day.

Considering the defendant's age, clean record, contributions to her community, exceptional and genuinely-heart-driven community service, significant acceptance of responsibility and remorse, and the Government's position on left-wing Capitol Building disruptors, a reasonable fine or a short period of probation is an appropriate penalty for a defendant highly unlikely to re-offend.

The Defense submits the foregoing memorandum in support of Ms. Sylvester's position on sentencing factors.

**Table of Contents**

SENTENCING MEMORANDUM OF KIMBERLY SYLVESTER                                  1

Table of Contents                                                           3

I. Kimberly Sylvester: a Grandmother, Nurse, and Volunteer of Generous Moral Character   4

II. January 6th — "My Curiosity" and "Pure Stupidity"                       9

III. The Aftermath                                                          11

IV. Defendant's Particularized Perspective                                  12

V. Sentencing a Petty Offense, Class B Misdemeanor                          16

    A) Sentencing Overview                              16

    B) Sentencing Limitations                           17

VI. Incapacitation, Rehabilitation, Retribution, Restitution, and Deterrence   19

VII. Avoiding Sentencing Disparities                                        24

    A) Background on Arrests and Punishments of Protest Misconduct on Capitol Grounds   24

    B) Only One Person Federally Charged for Protest Misconduct in the Capitol Prior to January 6, 2021   32

    C) Federal Prosecution of 2020 Political Riot Participants   35

        i. Portland, Oregon                36

        ii. Seattle, Washington            40

        iii. Minneapolis, Minnesota        43

        iv. Washington, D.C.               44

    D) Disparate Treatment of January 6 Participants   46

    E) Comparison of this Defendant to Other January 6 Defendants   48

    F) List of January 6 Cases To Consider in Evaluating the Proper Penalty:   48

VIII. Response to Government's Memorandum                                    52

IX. Appropriate Sentence for this Defendant                                 55

## I. KIMBERLY SYLVESTER:
### A GRANDMOTHER, NURSE, AND VOLUNTEER OF GENEROUS MORAL CHARACTER

Kimberly Sylvester was born in Maine and resides there to this day. She is 59 years old and lives in a three bedroom trailer home, alone. She has two prior marriages, both of which resulted in divorce, the first due to serious physical abuse and the second due to her husband's infidelity. Kim's two daughters are now grown and independent, and have their own kids. Kimberly has three grandchildren and loves being a grandmother. Kim has a clean record and has never been in trouble with the law prior to this case.



Kimberly with her grandkids



Nurse Kim with her daughter

Ms. Sylvester dedicated her life to the profession of nursing, first as a Licensed Practical Nurse and then as a Registered Nurse. She has worked in the nursing fields of Oncology, Ortho-Neuro, Dementia, Physical Rehab and general Medical/Surgical nursing, among others. She also cares for herself due to a variety of medical issues that undersigned counsel will not discuss in a public filing. *See* PSR, ECF No. 20.

In her spare time, Kimberly Sylvester volunteers for the Androscoggin Humane Society, she volunteers with veterans and Honor Flight, she volunteers to bring WWII veterans and their

families to Normandy, and she volunteers in her neighborhood to take care of neighbors and to

care for and walk neighbors' dogs. Her neighbor, Danielle, describes Kim's character thusly:

"She consistently demonstrates her compassion and generosity by selflessly helping her

neighbors in various ways, from walking dogs and house-sitting to assisting with meals and

neighborhood clean-ups." *See* Defense Exhibit 1. Another friend, who did not want for her name

to be part of the public record, but who has known Kimberly for 14 years and submitted a

character statement for the PSR, echoed the statement of Kim's neighbor. *See* PSR, ECF No. 20.

Another friend, Debra, also paints Kimberly as a considerate and caring. *See* Defense Exhibit 2.

But Kim also goes "above and beyond."

When my husband (a local Sheriff's Deputy) was tragically shot in the line of duty this past February, Kim's response was nothing short of extraordinary. She immediately sprang into action, offering her support in any way she could. Kim went above and beyond to ensure that we felt cared for during such a challenging time. From preparing meals and buying groceries to checking in on my husband's well-being as a nurse, Kim's kindness and compassion provided immense comfort and support to our family during this difficult period.

*See* Defense Exhibit 1.

Kimberly's compassion for her friends and

her community originated in Kimberly's

admiration of her parents, two World War II

veterans. Her mother was a 1st Lieutenant in the

U.S. Army. Her father was Sgt. Major Raymond

W. Sylvester, who bravely served in the U.S.



Kimberly and her sisters posing with their father in Normandy, France.

Army's 86th Chemical Mortar Battalion.[1] He fought in the Battle of the Bulge and was part of the liberation of the Buchenwald concentration camp, where he and his platoon discovered Jewish people facing the absolute worst conditions.[2] President Obama and President Trump each sent a personal invitation to Ms. Sylvester's father to attend the official U.S. ceremonies at the American cemetery in Colleville, France. Sgt. Maj. Sylvester received the French Legion of Honor medal at a Normandy landing commemoration ceremony at Utah Beach.



Kimberly's father at a commemoration event to which he was invited by President Obama.

The atrocities he observed committed by the Nazis had a profound impact on her father, causing for him to raise his four children as American patriots who opposed Nazism and who dedicated their lives to improving their communities.

Starting in 2008, Kimberly began organizing yearly trips for WWII veterans and their families for D-Day memorial events in France through Honor Flights. She was accompanied by her elderly father on some of these trips. Ms. Sylvester's father passed away a few



Kimberly and her father on an Honor Flight trip to France, meeting Sen. Bob Dole at a WWII monument.

---

[1] History of the 86th Chemical Mortar Battalion can be found here: https://www.4point2.org/hist-86.htm and here: https://worldwartwoveterans.org/wp-content/uploads/2022/01/The-86th-Chemical-Mortar-Battalion-presents-its-battle-history.pdf

[2] Background on the Buchenwald liberation can be found here:
https://www.nationalww2museum.org/war/articles/american-forces-enter-buchenwald-1945
https://encyclopedia.ushmm.org/content/en/timeline-event/holocaust/1942-1945/us-forces-liberate-buchenwald
https://www.usarcent.army.mil/News/Article/3015214/former-soldier-witness-to-buchenwald-concentration-camp/

years back, but Ms. Sylvester feels even more determined to continue their D-Day tradition following his death. Kimberly is flying to Normandy this year, with the permission of this Court, to continue the tradition.

Additionally, Kimberly volunteers with Honor Flight, a nonprofit organization that honors our nation's veterans "by bringing them to Washington, D.C. to visit the memorials built to commemorate their service and sacrifice." Ms. Sylvester's friend Cynthia, a retired law enforcement officer, provided a first-hand account of Kimberly's community service with Honor Flight—



Kimberly posing with Cynthia and an Honor Flight veteran.

We were part of their medical team. We roomed together and helped veterans when needed. I found Kim to be a thoughtful and caring nurse. She was hard-working and volunteered for every job that came up, from tying shoes, to changing soil, clothing, to being a friendly and attentive ear to veterans wanting to talk at the end of a very long and tiring da Kim's attitude was one of a helpful and compassionate person. She is very open, nonjudgmental and selfless. She has gone out of her way to show respect to members of the military and police whom we have encountered on our trips.

I thoroughly enjoyed working with Kim and getting to know her. We have done multiple trips with Honor Flight.

*See* Defense Exhibit 3.

The retried LEO went on to say—

Because of my Law Enforcement career, I am very careful about who I associate and spend time with. Kim has proven to be a kind and loyal friend who I can trust and rely on. I find Kim to be a genuine and caring person and am proud to call her my friend.

I have spoken with Kim at length about her actions on January 6th, 202[1]. She answered all of my questions very truthfully and was very clear from our first conversation about

accepting responsibility for her actions.

She is not someone that I would consider a danger to the community or at risk for further criminal action. (I'm not even sure that Kim had received a traffic ticket before this event happened.)

It is very evident to me that Kim is aware of the seriousness of the charges against her and understands how this will impact her life going forward. She has done some incredibly hard work on herself over the past several years and I believe she will continue to do so. Any leniency shown to Kim would not be taken lightly or for granted.

*Id*. Another friend, who is also a retired law enforcement officer but who did not want for her name to be part of the public record, who has known Kimberly for 14 years and submitted a character statement for the PSR, echoed Cynthia's statement. *See* PSR, ECF No. 20.

A consistent theme in all of Kimberly Sylvester's character references is her exceptional moral character, heartwarming community service, and genuine remorse about her January 6th conduct. *See also* Defense Exhibit 2, 3, 4 — mentioning Kimberly's remorse.

## II. January 6th — "My Curiosity" and "Pure Stupidity"

In Kimberly Sylvester's own words:

> The trip to Washington D.C. was intended to be nothing but a positive one. I was worried about our nation and was looking forward specifically, to the large prayer vigil that was to be held on January 5. Although it was cold and rainy, it was a peaceful and thoughtful event which included  prayers and singing of patriotic songs and hymns. The crowd was mostly middle aged and full of kind and friendly people.

> On January 6, I went to hear the speech at the Ellipse. Afterwards, I walked with the crowd towards the Capitol and I stood among thousands of others at the front. Eventually, things started to get more chaotic, and that I realized, but I was completely oblivious to the violent events taking place out of my vision and would not truly know what had occurred until days and months after. I state with all honesty, I never saw a single person engaging in any inappropriate or combative behaviors with any of the law enforcement present until after I was already inside the building. It was the things I wasn't aware of, that would lead to me making a terrible and regrettable decision to "see" what was going on closer to the building. Then I went inside the building.

> I have no reasonable or intelligent answer as to why I proceeded to enter the open doors into the building. Looking back, I think my curiosity as to what was happening would be my downfall. Had I known the full scope of events happening at that point, I would never had gotten any closer and certainly wouldn't have stepped inside, for any reason.

> I have always supported the men and women of law enforcement just as I do those who wear a uniform and have pledged their lives to our country's military. I have displayed this again and again in my everyday life and actions. I was raised by two World War 2 veterans and have always held veterans in great regard. I also am surrounded by law enforcement officers. They are included in my family, close neighbors and closest friends and associates. I admire them and are appreciative of the difficult job they have stepped up to do, everyday.

> I remember a few things from that fateful day, being inside of the Capitol. I remember seeing a physician speaking to the crowd and offering to help anyone who might need help. I remember seeing a large fire extinguisher laying in the middle of the floor and being puzzled as to how it got there. The most poignant thing I remember was walking into a room and seeing a large group of men angrily attempting to break down a door. I would later learn, this was the door to

the house floor. At that point, I removed myself from this area and sheltered aside with a group of officers. I stayed there for quite some time with them, before deciding to try and find my way out.

As I was walking towards where I believed the exits were, I had an encounter with a young man wearing a "Coon-skin hat", who was very close to me in the crowd. He stated to me it was a good day to "kill someone". To say this shocked me, would be an understatement. I found an officer and again, stood next to him, speaking to him. I told him I wanted to leave the building and at this point, he led me down a staircase directly behind us to attempt to help me get out. The door was blocked and I ascended the stairs and again stood at his position. I stayed with him for awhile before deciding I had to figure out how to get out and away from the chaos and I did proceed to find an exit shortly after. It was around this time, I heard the emergency warning signal stating there was a curfew, on my phone and my friend and I immediately left the area and proceeded to return to the rental apartment.

Looking back, this is what I know now. I entered the building with pure stupidity and there is simply no excuse for that. I have told everyone I have discussed this with, I and only I, made that decision to walk in and I will be the one to pay for this decision, which will affect me the rest of my life. It is hard to live with the fact that I was a part of a crowd who ultimately caused great harm to the Capitol police. I did not recognize at the time, the dynamics and the groups of people who were there that day, intending to reek havoc and commit serious crimes.

*See* Defense Exhibit 4.

In aid to the Government's investigation and prior to being charged, Ms. Sylvester cooperated with the FBI, voluntarily made statements to the FBI describing her conduct and state of mind, and voluntarily surrendered her mobile phone to be searched by the FBI.

### III. THE AFTERMATH

On the evening of January 6, after the Trump supporters left the Capitol area, the FBI declared that they were investigating "*violent activity*" at the Capitol.

The very next day, the FBI announced a change— the investment of their full resources into a broader search, an indiscriminate search of "*those involved,*" irrespective of nonviolence or the severity of an individual's involvement.

By January 8, 2021, the DOJ announced their first arrest for *nonviolent activity* that occurred on January 6.

To this day, almost three years later, the FBI's website, continues to say: "We have deployed our full investigative resources and are working closely with our federal, state, and local partners to aggressively pursue *those involved* in these criminal activities." (Emphasis added). For perspective, unlawful activities at the Capitol is a broad category that even includes stepping on the plants that grow on the grounds of the Capitol. *See* 40 U.S.C. § 5104(d).



Almost three years after January 6, on December 13, 2023, Kimberly Sylvester was arrested for her nonviolent entry into the Capitol Building.

## IV. DEFENDANT'S PARTICULARIZED PERSPECTIVE

The Government's broad-brush perspective of what happened on January 6 ignores the particularized perspective of the individuals in the crowd who came to protest lawfully but who followed the crowd into an unlawful demonstration inside of the Capitol. This defendant, as well as a large portion of the individuals in the January 6 crowd, did not have a complete picture of what was happening around her. The Government has the advantageous benefit of hindsight and an unprecedented collection of video and photographic evidence on which to prosecute all transgressions from January 6, 2021. Yet, the defendants, who were but individuals physically present in a roaring crowd, had a limited vantage point and understanding, and did not share in the advantage of this omniscient luxury while living through that moment.

In at least portions of its sentencing argument, the Government is asking for this Court to penalize the defendant based on its summation of the entirety of the evidence collected during the January 6 investigation. The Government is thus asking for this court to punish the defendant for conduct that she did not know about, for events she did not partake in, for destruction and violence she did not witness, for *severity* she did not experience, and for an *effect* she did not foresee. The defense, by comparison, is asking for this Court to view the offense from the defendant's perspective and to judge her conduct based on her understanding at the time of the offense.

The Government largely relies on facts that Ms. Sylvester did not know at the time of her transgression, nor could have known. **Ms. Sylvester did not know *on* January 6 what we know today *about* January 6.** In seeking to punish her for attending a lawful protest that was

escalated, by others, into an event of varying degrees of lawlessness, the Government is asking for the court to consider facts and circumstances that were never known to the defendant before or during her participation in January 6. As Kimberly Sylvester stated to her presentence officer, **"had I witnessed combat between civilians and officers, I would NEVER had proceeded to enter the Capitol Building."** Ms. Sylvester now writes to the Court in a letter — **"I state with all honesty, I never saw a single person engaging in any inappropriate or combative behaviors with any of the law enforcement present."** *See* Defense Exhibit 4.

Ms. Sylvester did not know, nor could predict, that a political protest in support of Donald Trump would amount to something entirely different. Trump rallies, up until January 6, 2021, had always remained peaceful, even family-friendly events.[3] The defendant did not and could not foresee the violent transgressions others would take on that fateful day. Even DC and Federal law enforcement agencies did not foresee how the protest would devolve.[4] Now that she sees the full picture, Kimberly is ashamed of being associated with the event. **"This day of Jan.6 has also brought me nothing but regret, remorse, shame,"** she writes to the Court. *See* Defense Exhibit 4.

Although she entered the Capitol Building to protest within it, Kimberly did so without understanding the complete picture around her. She did not see what led up to those Capitol Building doors being opened — who opened them, how they were opened — and did not realize the extent of the overall breach of the Capitol and how his presence would be interpreted *ex post*

---

[3] David Marcus, *Once A Curiosity Trump Rallies Are Now Joyous Celebrations*, THE FEDERALIST (Feb 11, 2020), https://thefederalist.com/2020/02/11/once-a-curiosity-trump-rallies-are-now-joyous-celebrations/.

[4] Betsy Woodruff Swan and David Lippman, *New Capitol Police document shows how unprepared they were for Jan. 6 riots*, POLITICO (Oct. 29, 2021), https://www.politico.com/news/2021/10/29/capitol-police-documents-unprepared-jan-6-riots-517478; Erik Dahl, *January 6th Intelligence Failure Timeline*, JUST SECURITY (Jun. 7, 2022), https://www.justsecurity.org/81806/january-6-intelligence-and-warning-timeline/.

*facto.* **"It was the things I wasn't aware of, that would lead to me making a terrible and regrettable decision to 'see' what was going on closer to the building."** *See* Defense Exhibit 4. Now she knows everything that transpired that day. And she is fully ashamed of her involvement. **"If I could go back and change my decisions, I would. And not just because it resulted in me being arrested but because it was simply wrong,"** Kimberly told her presentence officer. See ECF No. 20.

The Government also confers a type of *shared intent* on all January 6 participants in its standard January 6 sentencing memoranda. Yet, Ms. Sylvester was one of the thousands of people who gathered together for, what was supposed to be, a lawful, organized protest.[5] She did not know the protesters who committed violent crimes or who forced entry. **Kimberly came in peace**, as did many others. While a few protesters may have come to riot, **people like Ms. Sylvester came to exercise their First Amendment rights** (albeit many ended up doing so in an unlawful manner). There were thousands of protesters in total — who did not know each other and who did not share a singular mind. Only a fraction of the protesters had committed violent acts.[6]

---

[5] See Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, THE FEDERALIST (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("We were absolutely, completely shocked beyond comprehension to hear of any violence, considering our previous experience at Trump rallies and after hearing the president's speech at this one."). *See also* John Daniel Davidson, *'We Just Wanted Our Voices To Be Heard.' Capitol Protesters Speak Out*, THE FEDERALIST (Jan. 14, 2021), https://thefederalist.com/2021/01/14/we-just-wanted-our-voices-to-be-heard-capitol-protesters-speak-out.

[6] The FBI has estimated that between 2,000 and 2,500 people entered the Capitol on January 6. *See* Ryan Lucas, *Where the Jan. 6 insurrection investigation stands, one year later*, NPR (Jan. 6, 2022), https://www.npr.org/2022/01/06/1070736018/jan-6-anniversary-investigation-cases-defendants-justice. As of May 6, 2024, 510 January 6 arrestees have been charged with Section 111 charges, indicating that an even smaller portion of these individuals committed an actual assault. *See* Press release, 40 *Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol. Assault-specific charging data has not been made public by the DOJ.

The Government does admit, in a boilerplate paragraph added to its January 6 sentencing pleadings, that "each defendant should be sentenced based on their individual conduct." *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 90, *15 (D.D.C. March 16, 2022).[7] But the Government *then* asks this Court to disregard this requirement *just this once, just for this group of Trump protesters* — because —

> [E]ach individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum— have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. No rioter was a mere tourist that day.

*Id*. Yet, this is simply untrue. Ms. Sylvester, for example, did not cross multiple barricades — she walked up on the lawn and through open doors of the Capitol through which others were freely entering and exiting; and, she observed no people fighting with law enforcement officers prior to making her way inside.

It is inequitable to hold this defendant responsible for the *results* of a heated rally that grew entirely out of hand. Ms. Sylvester should be judged on her participation and what she knew and intended at the time of *her* transgression. The sentencing phase of a criminal case looks at individual blameworthiness. A sentence must be particularized to the individual who stands before the court with evidence relevant to her particular case facts. The sentencing of Ms. Sylvester should be limited to her *individual conduct* and *her* knowledge of the situation at hand.

---

[7] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.

### V. Sentencing a Petty Offense, Class B Misdemeanor

A) Sentencing Overview

Ms. Sylvester pleaded guilty to two petty misdemeanor offenses under 40 U.S.C. § 5104(e)(2)(G) for unlawfully demonstrating inside the United States Capitol Building and disorderly conduct in the same. *See* 18 U.S.C. § 3559(a)(7). Pursuant to §1B1.9 of the United States Sentencing Guidelines, the guidelines do not apply to this case. Ms. Sylvester is facing no mandatory minimums. Each Class B misdemeanor petty offense carries a *maximum* penalty of six months' imprisonment and a maximum fine of five thousand dollars, in addition to a ten-dollar special assessment. *See* 18 U.S.C. § 19; 40 U.S.C §5109(b); 18 U.S.C. §3571(b)(6). Petty offenses do not carry a term of supervised release. *See* 18 U.S.C. § 3583(b)(3).

Pursuant to her plea deal, Ms. Sylvester has agreed to pay restitution in the amount of $500, even though she did not personally touch or damage any property.

While the U.S. Sentencing Guidelines do not apply to this defendant, this court is still required to consider the sentencing factors outlined in 18 U.S.C. § 3553(a) in determining the appropriate sentence. *See* 18 U.S.C. § 3551.

The seven factors for this court to consider under 18 U.S.C. § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [*discussed supra*]

(2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation [*discussed infra*]

(3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute) [*discussed supra*]

(4) the sentencing range established through the application of the sentencing guidelines and the types of sentences available under the guidelines [*discussed supra*]

(5) any relevant "policy statements" promulgated by the Sentencing Commission [*inapplicable under §1B1.9 of the United States Sentencing Guidelines, commentary to which states: "For the sake of judicial economy, the Commission has exempted all Class B and C misdemeanors and infractions from the coverage of the guidelines."*]

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar *conduct* [*discussed supra*]

(7) the need to provide restitution to any victims of the offense [*discussed supra*]

B) Sentencing Limitations

While the sentencing court has discretion over imposing an appropriate penalty for each offense, Congress has placed limits. This court's ability to impose an available penalty is limited by 18 U.S.C. §§ 3551 and 3561(a)(3). *See United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023); *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence"). This court only has the power to impose (1) a term of probation, (2) a fine as authorized, **or** (3) a term of imprisonment. "Probation and imprisonment are alternative sentences that cannot generally be combined." *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). An exception is carved out in 18 U.S.C. § 3551 for a fine — a fine is explicitly permitted to be tacked to another penalty. No other tacking or conjunctive exceptions are noted in the Code.

Supervised release is the Code's exclusive form of post-confinement monitoring and may only be ordered if a defendant is sentenced to a term of imprisonment. *See* 18 U.S.C. §3583;

*United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). Supervised release, however, does not apply to petty offenses. *Id*. Supervised release conditions are subject to the mandatory and discretionary conditions outlined by Congress in 18 U.S.C. §3583.

Probationary conditions that this Court may order are limited to the mandatory and discretionary conditions outlined in 18 U.S.C. § 3563. Imposition of a discretionary condition must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)." *See* 18 U.S.C. § 3563(b).

Additional limitations on the imposition of a penalty include the underlying justification for the penalty. For example, a term of imprisonment cannot be imposed or lengthened for rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. § 3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011). An appropriate sentence is defined as "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." *See* 18 U.S.C. § 3553.

Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's restrictions on excessive fines and cruel and unusual punishment.

## VI. INCAPACITATION, REHABILITATION, RETRIBUTION, RESTITUTION, AND DETERRENCE

The main aims of sentencing have been accomplished pre-sentence in this case.

(A)    ***Rehabilitation*** and ***specific deterrence*** have been achieved through the humiliation of a an arrest, pretrial supervision with conditions, the process of being publicly shamed in the media for her charged conduct, and the plea of guilty to two criminal offenses from January 6 that will permanently mar the defendant's criminal record.



**"This day of Jan.6 has also brought me nothing but regret, remorse, shame,"**

Kimberly writes to the Court. *See* Defense Exhibit 4. The experience of being arrested, going through court appearances in two federal jurisdictions, conferences with counsel, public shaming in the media and on social media, constant contact with a probation officer — and federal criminal prosecution in and of itself — was more than Ms. Sylvester needed to deter her. The reality is that Ms. Sylvester was self-rehabilitated well ahead of the arrest, plea, and sentencing.

As Kimberly Sylvester stated to probation — "**I regret entering the capital on January 6th.  I was only there to voice my First Amendment right with no other intentions**." Ms. Sylvester is remorseful for unlawfully entering the Capitol Building.

Her previously clean record will now be permanently marked with a criminal conviction.

Further rehabilitation and specific deterrence are simply unnecessary for this defendant — especially in light of his age and status as a grandmother.

(B)      **Incapacitation** is unnecessary for Ms. Sylvester, an almost 60-year-old remorseful first-time offender.

Ms. Sylvester has been consistently remorseful about her conduct and participation in January 6. She is embarrassed of both her behavior and the association that she now permanently has with some of the worst events of that date, just based on her presence.

There is no cognizable need to divert public resources for incapacitation of an older, Class B petty offense defendant who was not violent and who does not show any signs of re-offending or any danger to the community moving forward. This is a grandmother of three!

Even statistically, as a first-time offender, this defendant has the lowest likelihood to re-offend, according to the U.S. Sentencing Commission's research on the recidivism of federal offenders.[8] A first-time offender who has not been convicted of a crime of violence or an otherwise serious offense should receive a sentence "other than imprisonment," according to Congress. *See* 28 U.S.C. 994(j) ("the general appropriateness of imposing a sentence other than

---

[8] *Recidivism of Federal Offenders Released in 2010*, U.S. SENTENCING COMMISSION (Sep. 30, 2021), https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

(C)     ***Restitution*** in the amount of $500 has been agreed to by the parties even though Ms. Sylvester did not individually damage or destroy any property in the Capitol.

(D)     In observing the arrests of January 6 defendants through the meticulous reporting of the mainstream media and seeing relentless prosecution of January 6 participants, the public has been provided with more than sufficient ***general deterrence***. Hundreds of thousands of news articles have been published about the arrests and prosecutions of January 6 defendants, and numerous congressional hearings related to January 6 have taken place. Donald Trump himself has been indicted for his role in the events of January 6. On top of that, the DOJ has created unique public-shaming web pages for every January 6 defendant, a digital version of tar and feathering.[9] The public has been put on clear notice that transgressions against the Capitol or the operation of the Federal Government will not be tolerated.

Conservatives and Trump supporters have been uniquely deterred as political groups—having grown genuinely frightened by engaging in any protest against the federal Government, a much deeper (and more troubling) general deterrence than is called for by penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees in September of 2021, only about 100 people arrived to protest, with police and media

_____

[9] Ms. Sylvester's devoted DOJ web page can be found here: https://www.justice.gov/usao-dc/defendants/sylvester-kimberly.

vastly outnumbering the protesters.[10] When Donald Trump was called into this courthouse for his initial appearance is August of 2023, protesters were difficult to find.[11] "[O]nly around a dozen supporters of the former president were outside the courthouse," reported Politico.[12]

Other political groups have also been deterred from staging protests by the January 6 arrests. The Virginia militia chapter leader of the "Boogaloo" movement (A.K.A. "Virginia Knights" and "Last Sons of Liberty") stated in a recorded video interview on August 18, 2023: "I haven't done any protests since January 6, 2021."[13]

Accordingly, the DOJ has already achieved general deterrence through its unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement, top to bottom — from the former President of the United States himself to individuals who briefly trespassed.

(E)   **Retribution** in this case has also been accomplished before the imposition of sentence — by the general public contributing significantly to the arrest of the individuals photographed inside of the Capitol.[14] A substantial portion of the January 6 defendants have been identified and

---

[10] *Police outnumber protesters at right-wing Capitol rally*, BBC NEWS (Sep. 19, 2021), https://www.bbc.com/news/world-us-canada-58612965.

[11] Kyle Cheney (@kyledcheney), Twitter (Aug 3, 2023, 8:05 AM), https://twitter.com/kyledcheney/status/1687072114359103488.

[12] Andrew Zhang, *Subdued crowd gathers outside Washington courthouse where Trump was arraigned*, POLITICO (Aug. 3, 2023), https://www.politico.com/news/2023/08/03/trump-indictment-courthouse-arraignment-00109643.

[13] Ford Fischer (@FordFischer), Twitter (Aug 18, 2023, 11:32 PM), https://twitter.com/FordFischer/status/1692741297717535039.

[14] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC CHICAGO (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284; Sukrit Venkatagiri, Tianjiao Yu, Vikram Mohanty, and Kurt Luther, *Sedition Hunters: A Quantitative Study of the Crowdsourced Investigation into the 2021 U.S. Capitol Attack,* WWW '23: PROCEEDINGS OF THE ACM WEB CONFERENCE 2023 (April 2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583514.

brought to FBI attention through "crowdsourcing" with the public's assistance.[15] Civilian groups such as *Sedition Hunters* have even been formed to identify and report those who may have been involved. Friends, coworkers, and even family members have reported a substantial portion of January 6 participants.[16] The FBI, in turn, has provided a sense of satisfaction to those who had made reports by arresting the identified individuals, no matter the extent of their role on January 6.[17] Retribution, accordingly, had been accomplished through the public's partnership with the FBI and the DOJ— and the arrests and prosecutions that followed.[18]

Therefore, each of the aims of sentencing — incapacitation, rehabilitation, retribution, restitution, specific deterrence, and general deterrence — have been met prior to or during the charging stages of this criminal case, before the imposition of the sentence itself.

---

[15] *Researchers study the crowdsourced investigation of Jan. 6, 2021*, VIRGINIA TECH (May 3, 2023), https://liberalarts.vt.edu/news/articles/2023/05/liberalarts-crowdsourced-investigation-study.html.

[16] Ryan J. Reilly, SEDITION HUNTERS: HOW JANUARY 6TH BROKE THE JUSTICE SYSTEM (2023).

[17] *How citizen investigators are helping the FBI track down Jan. 6 rioters*, PBS NEWS HOUR (Jan. 3, 2024), https://www.pbs.org/newshour/show/how-citizen-investigators-are-helping-the-fbi-track-down-jan-6-rioters.

[18] Press release, 40 *Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

## VII. Avoiding Sentencing Disparities

According to the Government, January 6 cases are incomparable to preceding criminal cases and thus exempt from fair comparison with any cases that are not January 6 cases. As such, the Government seeks a disproportionately high sentence for all January 6 participants, including ones convicted of nonviolent offenses. The problem with the Government's proposition is that the Government is responsible for creating the uniqueness of the January 6 prosecutions.[19]

### A) Background on Arrests and Punishments of Protest Misconduct on Capitol Grounds

In early October of 2018, the Women's March publicly planned to breach the Capitol and to shut down the Senate deliberations of Trump-nominated Supreme Court Justice Brett Kavanaugh— which, coincidentally, was a constitutionally mandated process under Article II, Section 2 of the United States Constitution.[20]



---

[19] While this Court has already commented at the sentencing hearing in *United States v. Krauss* that undersigned counsel's comparison to the Kavanaugh and BLM protesters is unpersuasive, the argument is being included in this memorandum for completeness. This argument is found on pages 24-47 of this memorandum. Page 47 begins the comparison to other January 6 cases, in the event that the Court wishes to move on.

[20] *In photos: Protesters rally against Supreme Court nominee Brett Kavanaugh*, CNN (Oct 6, 2021), https://www.cnn.com/2018/10/05/us/gallery/anti-kavanaugh-protests/index.html.

The left-wing group announced its plans and training initiatives on Twitter. "Hundreds are getting trained for direct action this morning," the group declared. [21] "Hundreds of people are being trained for today's #CancelKavanaugh action every 30 minutes this morning. We're going to flood the Capitol."[22] "We were planning to shut down the Capitol Building," they exclaimed in another tweet.[23] (*See screenshots supra, p.22.*)

  

They succeeded. Reporter Samantha York reported, "Police are setting up barricades to contain them." (*See screenshots above*). But Women's March protesters broke through barricades set up by Capitol police and flooded the Capitol building.[24] *The Crisis Magazine* tweeted, "@womensmarch just took the Capitol. Women, survivors, and allies walked straight past the

---

[21] Women's March (@womensmarch), Twitter (Oct 6, 2018, 10:13 AM), https://twitter.com/womensmarch/status/1048576951328407552.

[22] Women's March (@womensmarch), Twitter (Oct 6, 2018, 9:55 AM), https://twitter.com/womensmarch/status/1048572257604006912.

[23] Women's March (@womensmarch), Twitter (Oct 4, 2018, 3:43 PM), https://twitter.com/womensmarch/status/1047935356673437697.

[24] Adam Rosenberg, *Brett Kavanaugh protesters ignore police barricades, occupy the U.S. Capitol,* MASHABLE (Oct. 6, 2021), https://mashable.com/article/brett-kavanaugh-senate-confirmation-protests-us-capitol.

police, climbed over barricades, and sat down on the Capitol steps. ... This was inspiring. We're ready for this."[25] (*See screenshots, below.*)





More than 300 protesters were arrested on October 4, 2018.[26] Another 101 protesters were arrested the next day, on October 5. Another 164 people were arrested on October 6.[27]

Some of these protesters interrupted the Senate session in the middle of a constitutionally mandated process. On October 5th, six people were arrested in the Senate Gallery and charged with "Unlawful Conduct" under the local DC code, according to a Capitol Police press release.[28]

---

[25] The Crisis Magazine (@thecrisismag), Twitter (Oct 6, 2018, 2:30 PM), https://twitter.com/thecrisismag/status/1048641712162328576.

[26] Sophie Tatum, *More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill,* CNN (Oct. 5, 2018), https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html.

[27] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (Oct. 6, 2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators.

[28] Press release, *U.S. Capitol Police Respond to Multiple Instances of Unlawful Demonstration Activities,* UNITED STATES CAPITOL POLICE (Oct. 5, 2018), https://www.uscp.gov/media-center/press-releases/us-capitol-police-respond-multiple-instances-unlawful-demonstration

The next day, local news reported, "[o]ne adult female was arrested in the Senate Gallery in the United States Capitol Building for crowding and obstructing around 2:30 p.m. Around 3:45 p.m., 13 people were arrested and removed from several Senate Galleries. They were also charged with crowding and obstructing."[29] Everyone arrested by the Capitol Police was charged under a local DC code section.



These October arrests followed hundreds of prior arrests that took place in September — similar arrests of Progressive protesters interrupting the Senate hearings held for Brett

---

[29] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (Oct. 6, 2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators; Ralph Ellis, *Anti-kavanaugh protesters keep up the fight, even after he's confirmed,* CNN (Oct. 6, 2018) https://www.cnn.com/2018/10/06/politics/kavanaugh-protests/index.html.

Kavanaugh.[30] There were a total of 1,188 Kavanaugh protest arrestees between September and October of 2018. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

The Kavanaugh protesters were charged under the local DC code. Coincidentally, when Trump supporters were *initially arrested on January 6* for unlawfully protesting in the Capitol, they were also charged under the local DC code.[31] It was not until a few weeks later that the DOJ indicted the individuals who were initially charged under the local DC code.[32]

Based on early comments, FBI Director Christopher Wray did not appear to be planning to pursue peaceful Trump protesters for federal offenses, publicly seeking out only those who engaged in "violence and destruction."[33]

But then something changed. The federal Government made a decision about charging and pursuing January 6 participants, a choice that the Government did not make for the Kavanaugh protesters — the DOJ decided that all January 6 transgressors will be charged federally, irrespective of the level of involvement and irrespective of the severity of their individual conduct. Director Wray shifted his investigative focus from those who committed

---

[30] Amanda Becker, *Hundreds arrested in multi-day protests of U.S. Supreme Court nominee*, Reuters (Sept. 7, 2018), https://www.reuters.com/article/usa-court-protests/hundreds-arrested-in-multi-day-protests-of-u-s-supreme-court-nominee-idINKCN1LN2K6; Cheyenne Haslett, *Kavanaugh protests escalate, over 120 arrested on Capitol Hill*, ABC News (Sep. 24, 2018), https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599; *Natalie Delgadillo, Update: Capitol Police Have Arrested More Than 200 Protesters At Kavanaugh Hearings*, DCist (Sept. 4, 2021), https://dcist.com/story/18/09/04/kavanaugh-hearing-arrests.

[31] Press release, *U.S. capitol police arrests - January 6, 2021,* United States Capitol Police (Oct. 7, 2021), https://www.uscp.gov/media-center/press-releases/us-capitol-police-arrests-january-6-2021.

[32] *See, e.g., United States v. John Anderson*, 1:21-cr-00215, ECF No. 31 (D.D.C. July 8, 2021).

[33] Press release, *Thirteen Charged in Federal Court Following Riot at the United States Capitol,* DOJ (Jan. 8, 2021), https://www.justice.gov/opa/pr/thirteen-charged-federal-court-following-riot-united-states-capitol.



"*violence and destruction*" to the broader group of "*those who participated*."[34] This is why

peaceful protesters, like this defendant, were charged federally, instead of under the local DC

code.

The charging decision was consequential. Unlike local DC charges, Federal charges carry

significantly more weight and more expense. Reviewing a Kavanaugh case prosecution and case

disposition under DC law illustrates the sharp contrast.



Sandra Steingraber was one of the

Kavanaugh protesters arrested in the Gallery for

disrupting the Senate proceedings. She was arrested

by Capitol Police but charged under local DC code for the offense of "Crowding, Obstructing, or

Incommoding" under the Code of the District of Columbia § 22–1307, which penalizes the act of

---

[34] Press release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (Jan. 7, 2021), https://www.fbi.gov/news/pressrel/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

engaging "in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration."[35] The DOJ chose not to get involved. As such, the case was dismissed in DC as soon as Ms. Steingarber paid a $50 fine.

Ms. Steingarber was able to obtain this favorable outcome without counsel under DC's "post-and-forfeiture" procedure, which is a streamlined dismissal for a person charged with certain misdemeanor offenses that allows a defendant to post and simultaneously forfeit a particular sum of money, thereby obtaining a full and final resolution of the criminal charge. Moreover, a "post and forfeit" is not an admission or adjudication of guilt.

Ms. Steingraber later bragged about her disruption of Senate proceedings on Twitter.[36] Unlike its interest in the public statements of, and social media usage of, the January 6th defendants, the DOJ was uninterested in either the social media use or the post-arrest statements of the Kavanaugh protesters.

And, Ms. Steingraber's was not an anomalous case — 1,179 similar Kavanaugh protesters arrested in September and October received identical charges and "post and forfeit" dismissal dispositions. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

Importantly, this was not Ms. Steingraber's first charge or arrest— she had at least one prior arrest in DC at the time, according to DC court records— and for the same conduct. Ms.

---

[35] Compare with the code section the FBI charged every January 6 participant who entered the Capitol, 40 U.S.C. §5104(e)(2)(G), which makes it unlawful to willfully and knowingly "parade, demonstrate, or picket in any of the Capitol Buildings." And, a mirror version of this law appears under D.C. Code § 10–503.16(b)(7), which also makes it unlawful to willfully and knowingly "parade, demonstrate, or picket within any of the Capitol Buildings."

[36] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769.

Steingraber was actually one of 503 people who were repeat offenders and who received a "post and forfeit" disposition. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

Ms. Sylvester, by direct comparison to Ms. Steingraber, did not enter the Senate Gallery when she was in the Capitol, she stayed in the hallways. Unlike Ms. Steingraber, Ms. Sylvester had not planned to commit a criminal offense ahead of time. Unlike Ms. Steingraber, Ms. Sylvester did not directly interrupt Senate proceedings while making a scene in a chamber. And, unlike Ms. Steingraber, Ms. Sylvester did not plan out her behavior at all whatsoever prior to walking in.[37] Moreover, Ms. Sylvester had a clean record walking in, unlike Ms. Steingraber.

Comparatively, Ms. Sylvester's individual conduct is objectively less egregious than that of Ms. Steingraber. Yet, Ms. Steingraber walked away with a $50 forfeiture and a dismissal under local code (and no legal fees) while Ms. Sylvester was federally prosecuted, not offered any kind of dismissal disposition, placed on supervised pretrial release, convicted of two offenses, and is awaiting the potential of a sizable penalty that includes up to six months in jail.

---

[37] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769. Two years later, she tweeted: "Woke up thinking about the day Brett Kavanaugh was confirmed by the Senate and 13 women stood up in the gallery, 1 by 1, to disrupt the vote and were arrested and media reported they were screaming but actually they were making statements about sexual assault. I was one of them." Sandra Steingraber (@ssteingraber1), Twitter (Nov 3, 2020, 8:31 AM), https://twitter.com/ssteingraber1/status/1323618700457627650. According to D.C. Superior Court online records, Ms. Steingraber has been arrested two additional times after the Kavanaugh incident, for the same type of charge, and it has been identically disposed of under the post-and-forfeit disposition.

## B) Only One Person Federally Charged for Protest Misconduct in the Capitol Prior to January 6, 2021

Only one Kavanaugh protester was charged federally — *only one* — Tighe Barry. See *Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). Mr. Barry was charged under 40 U.S.C. §§ 5104(e)(2)(D) and (G), class B misdemeanor petty offenses. Yet when he was initially arrested and charged under the local DC code, Mr. Barry was charged with the more serious offenses of Resisting Arrest and Disorderly Conduct. *See* D.C. Superior Court Docket No. 2018 CMD 013221. Those charges were dropped, and the conduct was not prosecuted at all.



On September 6, 2018, in the public viewing area for the Senate Judiciary Committee hearing for Brett Kavanaugh, Mr. Barry pulled out a large sign with political writing, stood on top of a chair, and shouted something political. As Capitol Police approached him, he leaped forward and pushed a chair into a person who happened to have been sitting in front of him. *Barry,* 1:18-mj-00111-RMM, ECF No. 34 (D.D.C. October 11, 2019). Mr. Barry "had to be carried by his arms and legs out of the committee hearing room while he continued his

demonstration." *Id*. At the time, Mr. Barry had 14 prior arrests on his record for similarly disruptive behavior. *Id*.

Tighe Barry was the very first person — ever— who was federally charged for protest or disruptive behavior at the Capitol. *Barry,* 1:18-mj-00111-RMM, ECF No. 10 ("Notably, no other person charged with protest and/or disruptive-type behavior at the U.S. Capitol Grounds has been previously charged in federal court for the District of Columbia."). And, his federal charges did not encompass the full scope of his conduct, such as assault and resisting arrest.

Ms. Sylvester is not like Mr. Barry. She didn't personally interrupt an active session of Congress, she didn't hurt anyone, she didn't resist arrest, and she didn't defy law enforcement. Ms. Sylvester had a clean record and no preexisting intention to walk into the Capitol. Ms. Sylvester didn't need to be carried out of the Capitol by her arms and legs. Yet, even though Ms. Sylvester's conduct is more comparable to the other 1,179 Kavanaugh protesters who were arrested under the local DC code and given the "post and forfeit" dispositions, Ms. Sylvester was prosecuted more aggressively than the lone standout from the Kavanaugh protesters who assaulted a person in the Senate and had a long history of prior arrests.

Nonviolent January 6 protesters received disparate charging treatment as compared to the Kavanaugh protesters. But why?

The only difference between the nonviolent January 6 protesters and the nonviolent Kavanaugh protesters is ***politics***. Ms. Sylvester entered amid a crowd of Trump supporters while Ms. Steingraber and the 1,179 others were part of progressive groups. Both groups disrupted constitutionally-mandated proceedings. (The results from the January 6 protest, admittedly, yielded significantly more damage and unrest as a whole.)

The Government would chime in right about now with the extravagant claim, repeated in each of its sentencing memoranda, that the January 6 "attack defies comparison to other events" (an audacious disregard for the 1983 Capitol bombing).[38] More accurately described, January 6 was a collection of politically-inspired, protesting individuals, who lost control and succumbed to mob mentality — a political rally that got out of hand and revealed security weaknesses at our Capitol.[39] There were clearly some violent individuals in the crowd, but they were not the majority that day; the overwhelming majority of January 6 arrestees have been trespassers and unlawful demonstrators.[40]

_____

[38] It is important to note that January 6 was <u>not</u> the most destructive event to occur at the Capitol in recent years. The 1983 left-wing extremist bombing at the Capitol blew out "a wall partition and windows, ripping through the Republican Cloakroom, and damaging several works of art on the second floor. The bomb appeared to have been placed on or under a window well seat in a corridor leading to the Senate chamber," according to the Washington Post. *See* Ronald Kessler, *Capitol Bombing*, The Washington Post (11/9/1983), https://www.washingtonpost.com/archive/politics/1983/11/09/capitol-bombing/ed242af4-418f-4d8d-8819-3ba860b425ba. The damage from the politically-motivated explosion cost "at least $1 million to repair," in 1980's currency, according to the Post, which would be over $3.14 million in today's value when accounting for inflation. Compare that to the combined damage from January 6 — which, even after three and a half years, remains at around $2.88 million. *See* Press release, 40 *Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

Furthermore, no deadly weapons were discharged in the Capitol on January 6. In fact, FBI Executive Assistant Director Jill Sanborn's sworn testimony before the Senate Judiciary Committee on January 11, 2022, revealed that only two January 6 participants were charged with firearms offenses — and they did not bring firearms inside of the Capitol; another three had firearms offenses added for conduct unrelated to entry into the Capitol. Available at https://www.judiciary.senate.gov/meetings/the-domestic-terrorism-threat-one-year-after-january-6.

The significantly more serious 1983 Capitol bombing was the *discharge*, in the Capitol, of weapons capable of mass casualty and mass destruction.

[39] For example, one Capitol police officer claims he was outnumbered 450 to 1, armed with only a baton. Timothy Bella, *Capitol Police officer sues Trump on Jan. 6 anniversary, saying he 'directed the mob' to violence*, THE WASHINGTON POST (Jan. 7, 2022), https://www.washingtonpost.com/dc-md-va/2022/01/07/capitol-riot-trump-police-lawsuit-kirkland; *see also* Erik Dahl, *January 6th Intelligence Failure Timeline*, JUST SECURITY (Jun. 7, 2022), https://www.justsecurity.org/81806/january-6-intelligence-and-warning-timeline.

[40] Press release, 40 *Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

## C) Federal Prosecution of 2020 Political Riot Participants

The BLM political riots of 2020, which preceded the January 6, 2021 Capitol incident by a few months, show a glaring disparity in DOJ treatment of similarly situated defendants.[41] Although the DOJ had jurisdiction to charge — around 300 individuals were charged by the DOJ (this is a total number from 29 states and Washington, D.C.) — only the violent or serious offenders were pursued. Charges included attempted murder, arson, burglary, assaulting law enforcement, damaging federal property, malicious destruction of property using fire or explosives, felon in possession of a firearm and ammunition, possession of a destructive device, and serious cases of civil disorder.[42] Unlike its relentless dedication to convict January 6 participants, the DOJ decided to dismiss many of the violent charges against BLM protesters, including charges of assaults on law enforcement.[43]

---

[41] Available video footage of the 2020 riots has been collected and stored at https://riotarchive.com.

[42] Press Release, *Over 300 People Facing Federal Charges For Crimes Committed During Nationwide Demonstrations*, DOJ (Sep. 24, 2020), https://www.justice.gov/opa/pr/over-300-people-facing-federal-charges-crimes-committed-during-nationwide-demonstrations.

[43] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.



### i. Portland, Oregon



In Portland, Oregon, the federal courthouse — along with its police officers, local police department, and surrounding neighborhood— was continuously attacked by left-wing protesters for a sustained period lasting over 100 days.[44] While the federal crimes were deliberate and premeditated, only about 103 individuals were arrested throughout the four-month ordeal, most for arson and serious assaults on police officers.[45] The DOJ put out a press release on the relentless riots, saying: "violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly."[46] Yet, **the overwhelming majority of the riot defendants had their federal charges *dismissed*.**[47] *See also* Defense Exhibit 5, *Examples of 2020 Riot Case Dismissals in Portland*. These dismissal

---

[44] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.

[45] Unlike their public searchable list of January 6 prosecutions, the DOJ does not publicize its list of Portland cases. A collection of federal cases can be found by private individuals tracking and archiving publicly-revealed individual case data on AntifaWatch.net. See also *Seventy-four face federal charges from Portland protests*, AP NEWS (Aug. 27, 2020), https://apnews.com/article/1c1901dd9c286794791dacc39b0a6727.

[46] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, DOJ (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

[47] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.; Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-with-assaulting-police-case-dismissed-30-hours-community-service.

decisions were made despite the aforementioned DOJ press release calling the relentless riots "domestic terrorism."

In what world would it be considered "*justice*" for those who committed numerous felonious assaults, with injuries, on police officers to receive more lenient treatment than a Purple Heart recipient who cleaned the Capitol on January 6? Yet that is exactly the word that the DOJ used when dismissing the case of Joshua Warner (AKA "Eva"). Warner was arrested *three separate times* during the 2020 Portland riots for assaults on police, resisting arrest, criminal mischief, another assault on police, etc.[48] Warner was charged under federal law with civil disorder for "targeting the eyes of multiple law enforcement officers with a high-powered laser during an August 8, 2020 riot in North Portland," a DOJ press release read.[49] Yet, the DOJ did not pursue federal assault charges and dismissed the civil disorder charge in exchange for just 30 hours of community service, saying it was "in the best interests of justice." *United States v. Warner*, Case 3:20-cr-00442-HZ, ECF No. 26 (D. Or. Dec. 21, 2021).[50]



---

[48] Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, Fox News (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[49] *Press Release, Beaverton Woman Charged with Civil Disorder After Targeting Police Officers with High-Powered Laser,* United States Attorney's Office District of Oregon (Sep. 3, 2020), https://www.justice.gov/usao-or/pr/beaverton-woman-charged-civil-disorder-after-targeting-police-officers-high-powered-laser.

[50] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.155702/gov.uscourts.ord.155702.26.0.pdf.



**Ms. Sylvester did not receive a plea offer for dismissal in exchange for her outstanding and benevolence-motivated community service.** Instead, the DOJ decided that Ms. Sylvester's January 6 participation rendered her ineligible for deferred prosecution in D.C. Thus, even though her conduct is nowhere near the level of the Portland defendant, Ms. Sylvester will walk away with a criminal record — while the person who feloniously assaulted multiple police officers in Portland, then came back two additional times after being arrested, walked away above reproach. This wildly inequitable and disparate treatment is inexplicable in any way other than political bias.

Adding insult to injury, the small handful of individuals who were actually convicted of their federal crimes in Portland received *significant* leniency from the DOJ at sentencing.

For example, after securing a conviction for Kevin Benjamin Weier for the felonious depredation of Government property for the act of ***setting fire to the Portland federal courthouse***— a felony offense punishable by up to 10 years in prison, a $250,000 fine, and three years supervised release— the Government filed a five-page, bare-bones sentencing memorandum that asked to sentence the defendant to ***a one-year term of probation***. *See United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 39, *5 (D. Or. Nov. 10, 2021).[51]



---

[51] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.153765/gov.uscourts.ord.153765.39.0.pdf.

For perspective, compare the DOJ's request for Mr. Weier to the sentence requested for January 6 defendant Michael Stepakoff, a rabbi who was convicted of a petty misdemeanor for walking into the Capitol on January 6, shaking hands with a police officer, thanking him for his service, and walking out after only 5 minutes inside the building — "14 days in custody followed by three years' probation, 60 hours of community service and $500 in restitution." *See United States v. Stepakoff*, 1:21-cr-00096-RC, ECF No. 36, *27 (D.D.C. January 11, 2022).[52] Unlike Mr. Weier's acts of arson, the Rabbi's conduct in the Capitol resulted in no injuries and no damage to any property, nor did it endanger anyone's life. The disparity is glaring.

Furthermore, Mr. Weier's probation recommendation for a felony arson offense was agreed to via a plea agreement that <u>did not</u> reserve the right for the DOJ to seek a terrorism enhancement even though the described activity was deemed terrorism by the Attorney General. *See* Footnote 41; *United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 35 (D. Or. Aug. 19, 2021). Yet, all plea offers made to January 6 defendants, even *Class 1 misdemeanor* plea agreements for nonviolent January 6 trespassers, reserved the option for the DOJ to attempt to seek an upward departure for terrorism under U.S.S.G. § 3A1.4, n. 4. *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 75, *4 (D.D.C. Oct. 13, 2021).[53]

---

[52] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227275/gov.uscourts.dcd.227275.36.0.pdf.

[53] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.75.0_1.pdf.

### ii. Seattle, Washington



In Seattle, BLM protests led to similar arson and violence as in Portland — with similar commiseration from the DOJ.

While the destruction in Seattle during the summer riots was extensive, only two defendants were federally charged for their conduct.[54] (Additional riots in Seattle took place in later months and are discussed separately, *infra*).

The first Government sentencing memorandum filed in the Seattle cases was for a woman charged with felony arson of five police vehicles. The Government memo revealed how the DOJ viewed the progressive BLM protest in Seattle: "an important cause" that "should have been an inspiring event" with an "important message." *See United States v. Channon*, Case No. 2:20-cr-00129-JCC, ECF No. 76 (W.D. Wash. Feb 8, 2022).[55]

---

[54] Amy Radil, *These are the people who face criminal charges in Seattle after the protests*, KUOW (Jul. 9, 2020), https://www.kuow.org/stories/who-faces-criminal-charges-related-to-seattle-area-protests-here-s-a-roundup.

[55] Also available at: https://storage.courtlistener.com/recap/gov.uscourts.wawd.288533/gov.uscourts.wawd.288533.76.0.pdf.

The second sentencing memorandum that the Government filed for the Seattle cases was for a man accused of bringing a firearm to the BLM protest with the intent to kill police officers — arrested after throwing a 16-ounce can of beer through the window of a police cruiser and striking an officer in the face. In this memo, the Government described the BLM riot that resulted in millions of dollars in property damage in Seattle as "a peaceful but volatile protest." *See United States v. Parker*, Case No. 2:20-cr-00084-RSM, ECF No. 116 (W.D. Wash. Jun. 2, 2023).[56] (It's almost as if the DOJ chose such language to taunt conservatives, who were outraged at CNN for referring to the arsonous BLM riots in Kenosha, Wisconsin as "firey but mostly peaceful."[57])





In comparison, the rally on January 6 has only been described by the DOJ in sentencing memoranda as "a violent attack" and "a large and violent riot." *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 90, *1-2 (D.D.C. March 16, 2022).[58] The Government has

---

[56] Also available at: https://storage.courtlistener.com/recap/gov.uscourts.wawd.287719/gov.uscourts.wawd.287719.116.0.pdf.

*See also* Katherine Anne Long and Paul Roberts, *Downtown businesses assess damage, weigh reopening after nights of riots, looting and chaos,* THE SEATTLE TIMES (May 31, 2020), https://www.seattletimes.com/business/local-business/downtown-businesses-assess-damage-weigh-reopening-after-nights-of-looting-and-chaos; Claire Sprang, *Seattle To Pay $3.6 Million in Damages to Businesses Over 2020 BLM Riots*, THE WASHINGTON FREE BEACON (Feb. 22, 2023), https://freebeacon.com/democrats/seattle-to-pay-3-6-million-in-damages-to-businesses-over-2020-blm-riots.

[57] *See* Joe Concha, *CNN ridiculed for 'Fiery But Mostly Peaceful' caption with video of burning building in Kenosha*, THE HILL (Aug. 27, 2020), https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

[58] Also available at: https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.



never, in any pleading known to undersigned counsel, made any sympathetic statements in

commiseration with the underlying non-criminal protest on January 6 outside of the Capitol— a

protest that could technically also be described as an "*important cause"* that "*should have been*

*an inspiring event*." The hundreds of thousands of January 6 protesters who came to DC to

protest election integrity on January 6 or to support their political candidate, who they earnestly

believed had won the 2020 election, and who remained outside the Capitol and broke no laws —

were not given any credit by the Government in the way that credit was given by the DOJ to

non-criminal protesters in Seattle.[59] January 6 has never been described by any DOJ prosecutor

as "*a peaceful but volatile protest,*" even though, under the Government's own logic, it certainly

could have received such adoration.

---

[59] See, e.g., Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("There were hundreds of thousands of people all standing together peacefully in one spot for more than five hours. A small percentage of this group entered the capitol and perpetrated mayhem while hundreds of thousands were peacefully milling around outside. Video of the event shows other attendees remonstrating with some who broke windows or stood on statues, telling them to stop.").

### iii. Minneapolis, Minnesota

Perhaps the most startling disparity of all can be seen in a memorandum filed by the Government in the District of Minnesota, where hundreds of BLM rioters engulfed Minneapolis in flames— burning homes, businesses, and even people.

On May 28, 2020, in the middle of a BLM riot, a convicted felon, who was on probation at the time, set fire to a pawn shop, saying "Fuck this place. We're gonna burn this bitch down." *United States v. Lee*, Case No. 0:20-cr-00168, ECF No. 67, *2 (D. Minn. Nov. 4, 2021).[60]  A 30-year-old man was burned to death in that fire. *Id*. at *3.

In its sentencing memorandum, the DOJ brazenly excused the homicide— "[the defendant] appears to have believed that he was, in Dr. King's eloquent words, engaging in 'the language of the unheard.'" *Id*. *9. The Government's memo does not resolve the glaring fact that the defendant's words at the time of the offense — "*fuck this place, we're gonna burn this bitch down*" — are entirely inconsistent with his post-arrest explanation related to political expression. Instead, citing Dr. Martin Luther King, Jr., the DOJ requested *half* of the guidelines sentence for the homicide. *Id*. *7, 12. As a reminder, this homicide was committed while the defendant was on probation for having committed another felony.



---

[60] Also available at
https://storage.courtlistener.com/recap/gov.uscourts.mnd.189358/gov.uscourts.mnd.189358.67.0_2.pdf.

### iv. Washington, D.C.

In May 2020, BLM protesters set fires around the White House, caused the President to retreat to a bunker, and clashed with federal law enforcement for days on end.[61] Depicted on the video released by the Department of the Interior, protesters were pushing police shields, assaulting federal officers, and disobeying orders.[62] CNN televised protesters tugging a protective barrier away from federal officers.[63] None of these individuals were investigated or charged for their conduct. But January 6 defendants who committed the same acts were investigated, arrested, and charged.[64]







On May 31, 2020, then-Attorney General William Barr announced that "*violent radical agitators*" from the BLM protests in D.C. would be investigated and charged.[65] Indeed, the DOJ apprehended and charged individuals for acts of bank robbery, bank burglary, arson at the Supreme Court, Molotov

---

[61] *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, (May 31 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; Shawn McCreesh, *Protests Near White House Spiral Out of Control Again*, THE NEW YORK TIMES (May 31 2020), https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.

[62] Department of the Interior Press Secretary (@DOIPressSec45), Twitter (Jun 24, 2020, 1:53 PM), https://twitter.com/DOIPressSec45/status/1275849473701433345.

[63] Andy Ngô (@MrAndyNgo), Twitter (May 30, 2020, 1:30 AM), https://twitter.com/MrAndyNgo/status/1266602847182786567.

[64] See, e.g., *United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 48 (D.D.C. May 19, 2023).

[65] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, U.S. DEPARTMENT OF JUSTICE (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

cocktail attacks on police, and attacks on the Lincoln Memorial.[66] The January 6 investigation, on the other hand, was not limited to "*violent radical agitators.*" Instead, on January 7, 2021, Christopher Wray announced the investment of the full resources of the FBI into an indiscriminate search of "*those involved*" in January 6 misconduct, irrespective of nonviolence or the severity of an individual's involvement.[67] The result is that two-thirds of the individuals arrested for January 6 participation are charged with only nonviolent conduct.[68]





The overt disparity between the Government's choice to only pursue *violent agitators* from left-wing protests, and yet *all individuals* from the January 6 protest, yields an unavoidable conclusion: had a January 6 protester committed certain acts in the middle of a BLM protest she

---

[66] *See United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 59, *9 (D.D.C. Jun. 9, 2023).

[67] FBI Press Release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building* (Jan. 7, 2021), FBI, https://www.fbi.gov/news/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[68] *See* Press release, 40 *Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

would have gotten off scot-free, but because she committed such acts in the middle of a Trump

protest she was charged. That political discrepancy is very troubling.


**D) Disparate Treatment of January 6 Participants**

In 2021, undersigned counsel made numerous requests for dismissal dispositions for her

January 6 clients in hopes of receiving an outcome comparable to that of the Kavanaugh or

Portland arrestees. The Government, however, made it clear that the diversion programs, which

are touted on the U.S. Attorney's website as "enhancing a fair and efficient criminal justice

system," will not be offered to any January 6 participant, even though the DOJ also advertises

that, "[e]ach case is subject to individualized review for appropriate disposition."[69] Individuals

who happen to be January 6 participants need not apply. *But see United States v. Judd*, 1:21-

cr-40, ECF No. 203 (D.D.C. December 28, 2021) (detailing dismissal dispositions for left-wing

protest cases, even *felony* charges, in Portland, Oregon).

The Government's disparate treatment of the January 6 protesters, as compared to the

BLM and Kavanaugh protesters — as well as the Government's cherry-picked view on the

righteousness of only certain kinds of political riots — provides much-needed context to the

otherwise incomparable arrests and sentencing requests for January 6 defendants. Had the federal

government treated all riots in the same manner and prosecuted all rioters in the same manner,

this sentencing memo would have been a lot more simplistic. But alas, the DOJ has forced this

complexity and the extensive argument.

---

[69] *Diversion Programs*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (March 3, 2021), https://www.justice.gov/usao-dc/diversion-programs.

The DOJ's deliberate omission from federal prosecution of the BLM and Kavanaugh protesters is how the Government justifies the claim that January 6 participants could only be compared to other January 6 participants for purposes of criminal penalty imposition. Indeed, there are almost no nonviolent protest cases to compare to the January 6 defendants. That is because the *DOJ caused this disparity* by *only* having prosecuted nonviolent January 6 defendants — by selection, by choice.

As we learned **from the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate decision *not to do something* can create a legally-significant substantial impact through that inaction**. The discussion *supra* illustrates the Government's clear decision not to prosecute various offenses from other political protests which plagued the country in 2020. But as a result, an entire class of politically-motivated criminal defendants was omitted from sentencing comparables.

Accordingly, a question can be posed: *does the Government's decision not to charge Kavanaugh protesters under federal law "exert a substantial effect" on the comparable sentencing cases available to this court?* (To borrow phrasing from *Wickard)*. The inevitable answer, as we have explored here, is — yes. *See also United States v. Griffin*, 549 F. Supp. 3d 49, 59 (D.D.C. 2021) ("Disparate charging decisions in similar circumstances may be relevant at sentencing."); *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (citing *Griffin* for the same proposition); *United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) (same); *United States v. Robertson*, 588 F. Supp. 3d 114 (D.D.C. 2022) (same); *see also* 18 U.S.C. § 3553(a)(6) (directing judges to compare *conduct* as opposed to charges).

The defendant thus asks this Court to take into consideration the defendant's conduct in the context of the Kavanaugh protests of 2018 and the BLM protests of 2020, and the dispositions for those defendants, in order to render a fair sentence.

**E) Comparison of this Defendant to Other January 6 Defendants**

Nonviolent January 6 defendants did not walk away with a "post and forfeiture" disposition, like Ms. Steingraber from the Kavanaugh protest at the Capitol, nor a dismissal after community service, like someone who assaulted a federal police officer in Portland, nor complete non-prosecution, like the majority of other BLM protesters who could have been prosecuted for misdemeanor and even felony offenses committed in front of the White House. Instead, January 6 defendants who had been charged with nonviolent misdemeanor offenses have been *convicted* and faced sentences that ranged from probation to jail time.[70]

There are some January 6 cases specifically comparable to that of this defendant which the court should review and consider.

**F) List of January 6 Cases To Consider in Evaluating the Proper Penalty:**

- William Blauser was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced only to a $500 fine, in addition to restitution. *United States v. Blauser*, et. al., Case No.1:21-cr-00386-TNM, ECF No. 108 (D.D.C. Feb. 3,



---

[70] The Government's charting of January 6 sentences is available at: https://www.justice.gov/usao-dc/media/1331746/dl?inline

2022). Blauser "pushed through" officers to enter the Capitol and was "involved in a brief skirmish with law enforcement," "resisting" the officers, according to the Government. He exited 38 minutes after entering the Capitol.

- Danielle Doyle was convicted of 40 U.S.C. § 5104(e)(2)(G) and sentenced to 2 months of probation and a $3,000 fine, in addition to restitution. *United States v. Doyle*, Case No.1:21-cr-00269-TNM, ECF No. 34 (D.D.C. Oct. 5, 2021). Ms. Doyle entered the Capitol Building through a broken window, then traversed multiple floors of the Capitol, before exiting 25 minutes later.



- Sean Cordon was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 2 months of probation and a $4,000 fine, in addition to restitution. *United States v. Cordon*, et. al., Case No.1:21-cr-00269-TNM, ECF No. 37 (D.D.C. Nov. 11, 2021). He entered through a broken window, walked around, and then exited 4 minutes later using the same broken window



through which he entered.

- Jenny Cudd was convicted of 18 U.S.C. § 1752(a)(1) and sentenced to 2 months of probation and a $5,000 fine, in addition to restitution. *United States v. Cudd*, Case No. 1:21-cr-00068-TNM, ECF No. 97 (D.D.C. Mar. 24, 2022). She followed a crowd through open doors, walked around while taking photos and videos, prayed in a prayer circle, and walked out 19 minutes after entering. Ms. Cudd later proudly discussed her participation on social media and on television.



- Eric Cantrell was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 3 months of probation and a $1,000 fine, in addition to restitution. *United States v. Cantrell*, et. al., Case No.1:22-cr-00121-TNM, ECF No. 84 (D.D.C. Mar. 30, 2023). Mr. Cantrell climbed the walls of the Capitol, then entered the building through open doors, walked around for approximately 8 minutes, then walked out.



- William Cotton spent 20 minutes inside the Capitol building, during which time he chanted "traitor" along with the crowd. He was sentenced under 40 U.S.C. § 5104(e)(2)

(G) in this courtroom to 9 months of probation and 60 hours of community service, as well as restitution. *United States v. Cotton, et. al.*, Case No.1:23-CR-00002-JEB, ECF No. 35 (D.D.C. Oct. 2, 2023).

- Louis Michael Ciampi, Jr. was found guilty of unlawful parading in the Capitol after he climbed through a broken window to enter the Capitol (after being cautioned by a friend not to do that), went to a sensitive place within the Capitol, and smoked a marijuana joint in a senator's office. *See United States v. Ciampi*, 1:23-cr-00259-TJK, ECF No. 16 (D.D.C. Nov. 21, 2023). He remained in the Capitol for a total of 40 minutes. *Id*. Judge Kelly sentenced Mr. Ciampi to a period of 18 months of probation with the special conditions of 60 hours of community service and 60 days of location monitoring. *See United States v. Ciampi*, 1:23-cr-00259-TJK, ECF No. 18 (D.D.C. Nov. 30, 2023).

Ms. Sylvester's culpability is either lower than or consistent with each of the January 6 defendants described above. Unlike defendants who climbed on the walls of the Capitol, Ms. Sylvester stayed in normal walking areas. Unlike defendants who entered through broken windows, Kim entered through open doors. Unlike defendants who went inside offices, she only stayed in the hallways. Unlike defendants who bragged about their participation on social media, Ms. Sylvester made no statements. Unlike defendants who resisted or fought with police officers, Kim had friendly chats with officers. Ms. Sylvester certainly did not smoke any joints in the Capitol nor conduct herself in any egregiously defiant manner. And, unlike defendants who

expressed pride after their transgressions, Ms. Sylvester expressed serious remorse and regret —
at levels that appear distinguishable from every other January 6 defendant.

Ms. Sylvester's only aggravating factor is the amount of time that she spent inside the
Capitol; it was a bit longer than some of the other defendants, spanning 59 minutes. Yet, none of
her actual conduct inside the Capitol is aggravating. She chatted with police officers who
reminded Kim of her friends. Compare that to Mr. Blauser engaging in a "skirmish" with officers
inside of the Capitol. The amount of time inside the Capitol should not be a factor that increases
her sentence because such an elevation is not consistent with other January 6 sentences as
described above. Ms. Sylvester should be sentenced to no more than a fine, the sentence ordered
for William Blauser, who spent 38 minutes inside the Capitol. *See United States v. Blauser*, et.
al., Case No.1:21-cr-00386-TNM, ECF No. 108 (D.D.C. Feb. 3, 2022).

Moreover, Kim was punished for the length of time she spent inside the Capitol with two
misdemeanor convictions instead of one, unlike the defendants mentioned above. Additional
penalty for her is simply unwarranted.

## VIII. RESPONSE TO GOVERNMENT'S MEMORANDUM

In its sentencing memorandum, the
Government seeks a disproportionately high
sentence for Kimberly Sylvester. *See* ECF
No. 22. The Government justifies the
disproportionate sentence by intentionally

> Case 1:24-cr-00102-JEB   Document 22   Filed 05/30/24   Page 3 of 15
>
> *Defendant Sylvester's Role in the January 6, 2021 Attack on the Capitol*
>
> While at then-President Trump's Stop the Steal rally, Sylvester texted another individual
> ("Person 1"), "We are at the rally !! Holy shit the people here. Have seen Antifa but not many and
> none in this crowd." Person 1 responded, "Hi Honey! That's really good! Show of force! Good
> keep them out scare them! Love you too! Mwah!" Sylvester then liked the message calling for a
> "show of force" and "scare them." Sylvester's next message was, "Marching to Congress."

misrepresenting a text conversation between Ms. Sylvester and a friend, a conversation that the Defendant voluntarily handed over to the FBI after a voluntary interview with the FBI. This **conversation takes place over 3 hours prior to the offense, at a rally 2 miles away from the Capitol Building, and is about Antifa**. More egregiously, the last line mentioned by the Prosecutor was sent **3 hours after** the defendant clicked "like" on the message received by her; it was o. The Prosecutor failed to include the meta data for this conversation and failed to cite the physical distance between the events mentioned in this conversation and the time that passed in order to support his misleading narrative.



The conversation starts with Kim mentioning the huge size of the crowd and that she hasn't seen any Antifa in the crowd, to which her friend responds the words that the Government then uses against Ms. Sylvester to imply something to do with entering the Capitol building over 3 hours and 2 miles later. The friend's response is clearly on the Antifa text. It is only 3 hours later that Ms. Sylvester simply informs her friend that she is headed over to the protest in front of Congress.



As argued in the preceding sections, and as is supported by and proven by the memorandum submitted by the Government, the DOJ treats January 6 defendants disproportionately and disparately to other offenders. This type of meta data omission is intentional, by design, and consistent with the lack of dismissal dispositions and lack of consideration of January 6 defendants' individual characteristics and personal remorse.

Which brings undersigned counsel to the next point — the DOJ's refusal to consider the 18 U.S.C. § 3553(a) factors. The first part of this court's inquiry deals with the history and characteristics of this defendant. The Government's memorandum reads in a way that implies that a PSR does not even exist in this case. No deference is given to the personal history and characteristics of the defendant, or her acceptance of responsibility. And, the DOJ fails to consider § 3553(a)(6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," with the Prosecutor admitting that he failed to provide cases to this court that show a fair comparison. *See* ECF No. 22, *13 ("Sylvester's conduct is not identical to any of the above-mentioned defendants"). The DOJ publicly boasts about sentencing 884 January 6 defendants and yet could only find 3 non-comparable cases to add to its memorandum seeking to incarcerate a remorseful grandmother.[71] The comparable cases that the defense listed in the preceding section are intentionally ignored by the DOJ.

Moreover, the DOJ accuses the defendant of misrepresenting the truth just because she did not mention hearing a fire alarm. This is ridiculous and the Government never sought to inquire about whether she was paying attention to the sound or what she thought the alarm

---

[71] Press release, *40 Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

meant. There was no mention of a fire alarm in her interview. The Government just hopped on this bandwagon and sped off with the assumption. Ms. Sylvester was entirely honest in her voluntary interview, has been consistently remorseful, and does not deserve the abhorrent misrepresentations of her character and her conduct that were articulated to the Court by the DOJ. In case the court is curious, Ms. Sylvester does not recall the alarm — she did not notice nor pay attention to the alarm and can affirm as such under oath.

## IX. Appropriate Sentence for this Defendant

Considering:

- Kimberly Sylvester' clean record

- her age and status as a grandmother

- her benevolent and selfless lifestyle paired with Kim's exceptional devotion to community service

- her genuine remorse and regret

- the facts of his case in light of other January 6 cases

- *and* the Government's position on and treatment of the BLM and Kavanaugh protest cases

— a reasonable penalty (in addition to the already-imposed penalty of a conviction with a criminal record with two convictions, 7-month-long pretrial supervision, and payment of restitution) should be a reasonable fine — the same amount paid by Ms. Steingarber, the Kavanaugh protester who was arrested in the Capitol but who avoided prosecution through DC's

post and forfeit disposition. This proposed sentence is also consistent with the January 6

judgment of William Blauser, who was sentenced to a $500 fine after the Government described

Mr. Blauser as having "pushed through" officers to enter the Capitol and being "involved in a

brief skirmish with law enforcement," as well as "resisting" the officers, before exiting 38

minutes after entering. *See United States v. Blauser, et. al*., Case No.1:21-cr-00386-TNM, ECF

No. 108 (D.D.C. Feb. 3, 2022).

Alternatively, and in line with this courtroom's sentences for other January 6 defendants,

a reasonable penalty may be a few months of probation.

The sentence options proposed by the defense are sufficient, but not greater than

necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the

limitations placed on this Court by Congress and the Eighth Amendment.

Respectfully submitted,
By Counsel:
_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

<u>**CERTIFICATE OF SERVICE FOR CM/ECF**</u>

  I hereby certify that on June 3, 2024, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

        /s/
       Marina Medvin, Esq.